IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Mark Ballard, | |
|     Plaintiff, | |
|     v. | Case No. 16 C 8166 |
| Wesley R. Harmston, *et al.*, | Judge Jorge L. Alonso |
|     Defendants. | |

## Memorandum Opinion and Order

Pending before the Court is Defendant Sheriff Michael Kelley's ("Kelley") motion for summary judgment (ECF No. 173). For the reasons below, the Court grants the motion. Defendants Dr. Harmston and Wellpath's joint motion for summary judgment (ECF No. 179) has been granted for the reasons set forth in a contemporaneous Opinion. Accordingly, the Court dismisses this case.

## Background

### I.  Procedural Background

In 2016, Plaintiff Mark Ballard ("Ballard") filed the instant action in this Court. (*See* ECF No. 1.) The remaining defendants are Kelley, Correct Care Solutions, LLC—now known as Wellpath LLC ("Wellpath")—and Dr. Wesley R. Harmston ("Dr. Harmston"). In Ballard's operative amended complaint, he brings various claims under 42 U.S.C. § 1983 related to Defendants' conduct. (*See* First Am. Compl. ("Am. Compl."), ECF No. 21.) Specifically, Ballard claims that (1) all Defendants violated his civil rights under the Fourth, Eighth, and Fourteenth Amendments by failing to provide Ballard adequate medical care and treatment and by failing to intervene to prevent the violation of Ballard's civil rights; and (2) Dr. Harmston failed to exercise

due care in treating Ballard's injuries, for which Wellpath is also liable as Dr. Harmston's employer.

In addition to naming Kelley as a defendant, Ballard also originally sued four other officials from the Sheriff's Office (Kaupus, Josephson, Santerelli and O'Leary), as well as the Will County Adult Detention Facility (the "Jail") itself. Of these additional defendants, Ballard only served Santerelli. (Joint Status Report ¶ A.5., ECF No. 47.) Ballard elected not to serve the other defendants. (*Id.*) The Court granted Ballard's oral motion to dismiss Santerelli from this action on March 15, 2018, leaving Kelley as the sole defendant from the Sheriff's Office. (Minute Entry dated March 15, 2018, ECF No. 48.)

On April 14, 2023, Judge Kim struck Ballard's two-sentence purported expert report because it lacked the information required under Federal Rule of Civil Procedure 26(a)(2)(B). (Minute Entry dated April 14, 2023, ECF No. 170.)

Following discovery, Kelley filed a motion for summary judgment as to Ballard's claims (ECF No. 173). Wellpath and Dr. Harmston also filed a joint motion for summary judgment, which is addressed by the Court in a contemporaneous, separate Opinion. (ECF No. 179.) Ballard did not file a response to either motion. Ballard is currently proceeding *pro se*, although he was represented by various appointed attorneys from shortly after this case's inception through the end of January 2023, including throughout discovery. (ECF Nos. 11, 153.) On March 13, 2023, Ballard filed a motion "for self-representation" and for time to seek out new counsel. (ECF No. 161.) Ballard identified his contact information as 315 Healy Ave., Romeoville, IL 60446, (331) 270-5306, markballard1972@yahoo.com. Ballard's physical address was correctly entered on the docket. On April 12, 2023, Ballard filed documents that again indicated he could be contacted at the same Romeoville address. (ECF No. 169.)

2

Kelley filed his motion for summary judgment on May 26, 2023, as well as a copy of the Notice to Pro Se Litigant Opposing a Motion for Summary Judgment required by Local Rule 56.2 ("Notice") (ECF No. 177) and a certificate of service stating that copies of the motion for summary judgment and related filings, including the Notice, were served on Ballard via U.S. Mail to Ballard's Romeoville address (ECF No. 178). Based on this, the Court finds that Ballard has had sufficient notice of and time to respond to the motion.

## II. Factual Background

The following facts are undisputed unless otherwise noted.[1] The Court additionally assumes familiarity with and incorporates herein the Background Section set forth in its contemporaneous Opinion regarding Dr. Harmston and Wellpath's joint motion for summary judgment.

---

[1] Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment. The Court enforces Local Rule 56.1 strictly. *See McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 790 (7th Cir. 2019) ("We take this opportunity to reiterate that district judges may require strict compliance with local summary-judgment rules."). Where one party supports a fact with admissible evidence and the other party fails to controvert the fact with citation to admissible evidence, the Court deems the fact undisputed. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218–19 (7th Cir. 2015); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817–18 (7th Cir. 2004). This does not, however, absolve the party putting forth the fact of the duty to support the fact with admissible evidence. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012). In this case, Ballard did not respond to any Defendant's statement of facts. Accordingly, the Court has deemed admitted each of Defendants' facts to the extent that such fact was supported by citation to record evidence. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). Even so, Ballard's failure to file a response is not a basis for automatically granting the motion. *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021). Rather, the Court is mindful that the moving party has the "ultimate burden of persuasion" to show entitlement to judgment as a matter of law. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). The Court will apply these standards in evaluating the record. The Court refers to Kelley's statement of facts (ECF No. 174) as "Kelley SOF" and to Defendants Wellpath and Harmston's statement of facts (ECF No. 181) as "Wellpath SOF."

In August 2014, Ballard was arrested and became a pre-trial detainee at the Jail while his criminal case was pending in the Will County Circuit Court. (Kelley SOF ¶ 17.) Ballard was incarcerated at Will County Jail from August 10, 2014, to February 24, 2022, when he was released on bond. (Wellpath SOF ¶ 14.)

Shortly before he was arrested, Ballard was involved in an altercation where he suffered injuries to his head and face, as well as injuries to his hands, ribs, and legs. (Kelley SOF ¶ 18.) When Ballard arrived at the Jail, he was initially housed in the medical unit. (*Id.* ¶ 19.) One or two days later, Dr. Harmston saw Ballard and assessed him. (*Id.* ¶ 20.) Dr. Harmston, a physician licensed to practice medicine in Illinois, worked for Correct Care Solutions, LLC ("CCS") providing medical care to inmates at the Jail from 2012 to 2015, when he was succeeded by Dr. Kim. (*Id.* ¶¶ 10–11.)

During this visit, Ballard told Dr. Harmston that he recently had hernia surgery and had stitches which needed to be removed in the coming weeks. (*Id.* ¶ 21.) After assessing Ballard, Dr. Harmston cleared him to be moved from the medical unit to general population housing. (*Id.* ¶ 22.) At his deposition, Ballard testified the stitches from his hernia surgery were never removed and either fell out on their own or were covered up by skin. (*Id.* ¶ 23.) One of the medical records from the Jail contains an entry indicating that the hernia stitches were removed on August 21, 2014. (*Id.* ¶ 24.) While he was detained at the Jail, Ballard submitted sick call slips to ask for medical treatment. (*Id.* ¶ 25.) Throughout the time that Ballard was detained at the Jail, he regularly saw nurses and doctors about his medical concerns. (*Id.* ¶ 26.) Ballard was also taken to see offsite doctors on several occasions, including a neurologist, a urologist, a pediatric eye doctor, an adult eye doctor, and a dermatologist. (*Id.* ¶ 27.) The process for offsite medical care was for Ballard to see the doctor at the Jail first so that doctor could assess Ballard and then

4

make a recommendation for him to be seen by an offsite specialist. (*Id*. ¶ 28.) When Ballard inquired as to when he would get to see the offsite eye specialist, he was told there was a problem finding a doctor who would see him. (*Id*. ¶ 29.)

In his answers to interrogatories, Ballard did not identify any sheriff or warden at the Jail as being among the persons to whom he communicated any complaint about his medical care. (*Id*. ¶ 30.) The highest-ranking person in the Sheriff's Office with whom Ballard communicated about his medical care was a sergeant. (*Id*. ¶ 31.) In his responses to requests for production of documents, Ballard stated that other than the inmate grievances produced by the Sheriff's Office, he has no written communications which contain or reflect his complaints about his medical care. (*Id*. ¶ 32.)

At all times while Ballard was detained at the Will County Jail, the Sheriff's Office had written policies concerning inmate medical care and treatment. These policies include the following: (i) Section 2210–Medical Administration, (ii) Section 2360–Medical Personnel, (iii) Section 2400–Health Care Services, (iv) Section 2420–Medical Screening, (v) Section 2421–Inmate Health Categories, (vi) Section 2430–Sick Call, and (vii) Section 2440–Medical Philosophy. (*Id*. ¶ 6.) These policies included:

- providing continuity of medical care between the time an inmate is admitted to the Jail until the time the inmate is discharged, including referral to outside health care providers when indicated (*id*. ¶ 7);
- contracting with CCS/Wellpath to deliver health care services to inmates at the Jail (*id*. ¶ 8) and "to operate and maintain a properly staffed and equipped Health Care Services Unit to provide routine and emergency care to [Jail] inmates and staff" (*id*. ¶ 9);

5

- requiring individuals who provide health care services at the Jail to possess the appropriate state and federal licenses, certifications and registrations (*id*.);
- for each inmate to receive a medical screening upon arrival, a comprehensive physical examination within 14 days of admission, and ongoing clinical services as needed (*id*. ¶ 12);
- having the contracted provider identify and arrange care by appropriate health care specialists in the event an inmate needs specialized care for chronic and/or rehabilitative purposes (*id*. ¶ 13);
- for inmates to have daily access to health care staff by making written requests through a "Sick Call" (*id*. ¶ 14);
- that "all matters concerning clinical judgment are the sole province of the medical practitioner, and are not countermanded by non-clinicians" (*id*. ¶ 15); and
- making housing assignments for inmates according to the inmate's medical needs, or absence thereof, as identified by the Health Care Services Unit (*id*. ¶ 16).

## Legal Standard

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wackett v. City of Beaver Dam*, 642 F.3d 578, 581 (7th Cir. 2011). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Summary judgment is the proverbial put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020) (internal quotation

6

marks omitted). "To defeat a motion for summary judgment, the party opposing it must make a 'showing sufficient to establish the existence of [any challenged] element essential to the party's case, and on which that party will bear the burden of proof at trial.'" *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893–94 (7th Cir. 2018) (quoting *Celotex v. Catrett*, 477 U.S. 317, 322 (1986)). The court may not weigh conflicting evidence or make credibility determinations, but the party opposing summary judgment must point to competent evidence that would be admissible at trial to demonstrate a genuine dispute of material fact. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013). "A mere scintilla of evidence in support of a claim will be insufficient; there must be evidence on which a jury could reasonably find for the nonmoving party." *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008) (quoting *Insolia v. Philip Morris Inc.,* 216 F.3d 596, 599 (7th Cir. 2000)).

## Discussion

Pre-trial detainees have a right to adequate medical care under the Fourteenth Amendment. *McGee v. Parsano*, 55 F.4th 563, 569 (7th Cir. 2022) (citing *Kingsley v. Hendricksen*, 576 U.S. 389, 397 (2015)). The Seventh Circuit set forth the following test:

> For a pre-trial detainee to prevail on a claim of deficient medical treatment, he must demonstrate two things. First, he must show that the defendants acted purposefully, knowingly, or recklessly. . . . A showing of only negligence or even gross negligence will not suffice to meet this standard. . . . Second, he must proffer evidence showing that the course of treatment he received was objectively unreasonable. . . . This standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided medical care and to gauge objectively - without regard to any subjective belief held by the individual - whether the response was reasonable.

7

*Turner v. Paul*, 953 F.3d 1011, 1015 (7th Cir. 2020) (cleaned up) (citing *McCann v. Ogle Cnty., Illinois*, 909 F.3d 881, 886 (7th Cir. 2018); *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018)).

In the present case, Ballard brings an official capacity claim against Defendant Sheriff Kelley, alleging his right to adequate medical care was violated while he was a pre-trial detainee at the Jail. (Am. Compl. ¶ 31.) Thus, Ballard's claim is really a claim against the entity of which Sheriff Kelley is an agent. *See Sow v. Fortville Police Dep't*, 636 F.3d 293, 300 (7th Cir. 2011) (an "official capacity suit is another way of pleading an action against the entity of which the officer is an agent."); *Walker*, 526 F.3d at 977 (treating an action against a sheriff in his official capacity as a suit brought against the Cook County Jail). Kelley contends that he is an agent of the Will County Sheriff's Office.

A local governmental entity like a sheriff's office can only be held liable under Section 1983 for its own constitutional violations and is not vicariously liable for the constitutional torts of its employees. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–94 (1978); *cf. Walker*, 526 F.3d at 977 (applying *Monell* to claims against sheriff in his official capacity). Accordingly, to hold the Will County Sheriff's Office liable, Ballard must have evidence to show: (1) inmate medical care was denied pursuant to a municipal policy, (2) policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) the municipal action was the "moving force" behind his own constitutional injury. *Pulera v. Sarzant*, 966 F.3d 540, 550 (7th Cir. 2020) (citing *Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020); *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404–07 (1997)) (internal punctuation omitted). "The central question under *Monell* is 'always whether an official policy,

8

however expressed[,] ... caused the constitutional deprivation.'" *Turner*, 953 F.3d at 1016 (quoting *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378 (7th Cir. 2017)).

Defendant Kelley argues that Ballard's *Monell* claim fails as a matter of law because there is no evidence to establish any of these three elements. The Court agrees.

### 1. Municipal Policy

First, to prove the existence of a municipal policy, a plaintiff can offer evidence of: (i) an express or written policy, (ii) a widespread custom or practice, or (iii) a deliberate act by a decision-maker with final policymaking authority. *King v. Kramer*, 763 F.3d 635, 649 (7th Cir. 2014) (citing *Ienco v. City of Chicago*, 286 F.3d 994, 998 (7th Cir. 2002)). Here, Ballard bases his claim on the second theory of liability, alleging there was a widespread practice of denying appropriate medical care to inmates at the Jail. (Am. Compl. ¶ 31.) The Seventh Circuit has "not adopted bright-line rules defining 'widespread custom or practice,' but there must be some evidence demonstrating that there is a policy at issue rather than a random event or even a short series of random events." *Bridges v. Dart*, 950 F.3d 476, 479 (7th Cir. 2020). "The plaintiff must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Id.* At the very least, Ballard "must point to other inmates injured by that practice." *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 617 (7th Cir. 2022).

Ballard fails to introduce any evidence of a widespread practice. The only evidence of any inadequate medical care consists entirely of Ballard's testimony regarding his own experience at the Jail. Although Ballard alleged that other unidentified inmates similarly alleged in grievances and lawsuits that they too were denied appropriate medical treatment (Am. Compl. ¶ 31), Ballard has never identified any such persons or produced any information to substantiate

9

this allegation. Further, grievances and complaints at most demonstrate that Jail personnel were aware that the inmates *accused* them of denying medical care, not the Jail personnel's knowledge of the *legitimacy* of those complaints. *Bridges*, 950 F.3d at 480 n.4 (citing cases). Defendant, on the other hand, submits evidence that the Sheriff's Office had several written policies in place during the years at issue that were designed to ensure that Jail inmates received appropriate medical care, which Ballard does not dispute.

Further, Ballard fails to even identify sufficient evidence of inadequate medical care. Ballard alleges he was denied appropriate medical care in the following ways:

(a) he should have stayed in the medical unit after he first arrived at the Jail, but was instead transferred to general population, which required him to exert himself physically by standing for head counts and retrieving trays and laundry and caused him severe pain;

(b) he continued to complain to Jail personnel about his injuries, pain, and need for treatment, including for his head injury, which were ignored until he was prescribed medication that was supposed to be for pain but was in fact to treat withdrawal symptoms, which Ballard did not have;

(c) stitches from his pre-arrest hernia surgery should have been removed shortly after his arrival at the Jail but were not;

(d) he should have received an MRI for his pre-arrest head injuries shortly after arriving at the Jail but he did not receive the MRI until August 2015;

(e) he should have been taken to an eye specialist shortly after May 2015 but was not taken until April 2016, and then experienced a similar delay for the follow-up appointment; and

(f) he should have been seen by a neurologist but was not allowed to do so.

(Am. Compl. ¶¶ 15–22). Ballard alleges that "[a]s a result of the lack of care and inadequate care Ballard received, Ballard continues to suffer extreme pain, migraine headaches, double vision, hearing loss, numbness in his face, slurred speech, and mental and emotional distress." (*Id.* ¶ 23.)

The record is entirely devoid of any evidence that would support five of Ballard's six allegations of medical denial or delay. Allegations (b) and (f) are summarily dealt with. There is no mention, let alone evidence, in the record of any failure to prescribe pain medication or to refer to a neurologist, or of any prescription for withdrawal symptoms that Ballard did not have. To the contrary, Dr. Harmston testified, and Ballard's medical records show, that Ballard was prescribed 1000 mg of Tylenol and 500 mg of Naprosyn—forms of pain medication—for 14 days only one or two days after his arrival to the Jail. And Ballard himself testified that he saw a neurologist for his migraine headaches at the recommendation of a Jail physician. At the summary judgment stage, a plaintiff can no longer rely merely upon allegations—there must be evidence to back it up. *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004) ("The mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the nonmovant must present definite, competent evidence in rebuttal.").

Next, Ballard alleges that he should have received an MRI for his pre-arrest head injuries shortly after arriving at the Jail but did not receive the MRI until August 2015. Ballard proffers nothing but his own opinion—in the form of unverified allegations—in support. There is no testimony, affidavit, medical records, or expert opinion indicating that Ballard required an MRI before August 2015 or illuminating why he alleges an MRI was even necessary.

On the other hand, Ballard's medical records from Bolingbrook Hospital show that Ballard received two head CT scans at Bolingbrook Hospital on August 10 and 11, 2014, which records Dr. Harmston reviewed on August 12, 2014, as part of Ballard's medical intake. Based on his review of the intake records, Dr. Harmston ordered Ballard to sleep in the bottom bunk for 90 days. The record reflects that Ballard thereafter regularly saw nurses and doctors about his medical concerns. Ballard was taken out of the Jail on several occasions to see offsite doctors,

including a neurologist, a urologist, a pediatric eye doctor, an adult eye doctor, and a dermatologist. Then in August 2015, Ballard did undergo an MRI. There is nothing in the record indicating that the results of the MRI were abnormal or what the effect of an earlier MRI would have been. *Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir. 2002) ("[P]risoner who complains that delay in medical treatment rose to the level of a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment in order to succeed[.]" (citing *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996))). In short, there is simply no evidence to support Ballard's allegation that medical care was delayed or denied with respect to an MRI.

Ballard next alleges that because he was transferred out of the medical unit into the general population shortly after arriving at the Jail, he was required to exert himself physically, such as by standing for head counts, and retrieving meal trays and laundry, which caused him "severe pain." (Am. Compl. ¶ 17.) There is no evidence whatsoever—whether in the form of Ballard's testimony or affidavit or an expert opinion—that the move to general population caused Ballard pain or that there was any medical reason that Ballard should have stayed in the medical unit. To the contrary, Dr. Harmston testified that he made the decision to clear Ballard from medical housing based on his medical evaluation and observation of Ballard. In short, there is no evidence to support Ballard's bald allegation that medical care was delayed or denied with respect to his move to the general population.

Ballard also alleges that he should have been taken to an eye specialist shortly after May 2015, but was not taken until April 2016, and then experienced a similar delay for the follow-up appointment. Again, there is no evidence in any form to support Ballard's claim. There is nothing to show that Ballard needed to see an eye specialist in May 2015 as he alleges or, even if he did,

that he suffered any detrimental effect by waiting until April 2016. *Walker*, 293 F.3d at 1038. Further, nothing in the record indicates that the wait time was within the Jail medical staff's control. At his deposition, Ballard stated that when he inquired about the status of his offsite appointment, he was told there were difficulties in finding an offsite doctor who would see him. The unavailability of outside specialists or scheduling difficulties do not constitute the denial of medical care. *See id.* (courts do not presume delays in specialist treatment are attributable to prison medical professionals, but rather require evidence showing the delays were within the control of the medical staff); *see also Langston*, 100 F.3d at 1241 (delays in medical treatment due to scheduling difficulties or bureaucratic obstacles are not unconstitutional).

Next, Ballard alleges that stitches from his pre-arrest hernia surgery should have been removed shortly after his arrival at the Jail but were not. Ballard testified that the doctor who performed the hernia surgery told Ballard his stitches needed to be removed within two weeks of the surgery. Defendant points to Ballard's medical records, which show the stitches were removed on August 21, 2014 and results in a dispute of fact. Even so, however, the dispute is not material to the resolution of the issue before the Court. First, inferring in Ballard's favor that his stitches were not removed and either fell out on their own or were covered up by skin, there is no evidence of any detrimental effect. *Walker*, 293 F.3d at 1038. Second, one isolated instance of denied medical care does not, without more, show a widespread pattern. *See Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020) (in case involving only one person complaining of delayed medical care, five instances over a 19-month period was insufficient to show a widespread policy); *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) (in case involving only one person complaining of delayed medical care, four instances over an 11-month period was insufficient to show a widespread policy).

13

There is simply no evidence that might suggest, let alone prove, that a widespread practice exists.

2. **Deliberate Indifference**

Even if there were a genuine dispute of fact regarding a widespread practice, Ballard's claim still fails because there is no evidence that a policymaker was deliberately indifferent. Although "deliberate indifference to a detainee's medical needs is not . . . required to sustain a Fourteenth Amendment claim[,] . . . the concept of deliberate indifference does come into play in assessing liability of a governmental entity under *Monell*." *Whitney v. Khan*, No. 18 C 4475, 2021 WL 105803, at *6 (N.D. Ill. Jan. 12, 2021).

An official acts with deliberate indifference when the official: (i) is aware of facts from which an inference could be drawn that a substantial risk of harm exists, and (ii) responds with a reckless disregard for the known serious medical need, either by inaction or woefully inadequate action. *Eagan v. Dempsey*, 987 F.3d 667, 695 (7th Cir. 2021). The plaintiff need not show that the official intended harm or believed that harm would occur but must present evidence showing more than negligence by the official. *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011).

In this case, there is no evidence showing that any policymaker was aware of the alleged inadequacies in Ballard's medical care. Ballard alleges that the officials holding the positions of sheriff and warden are policymakers for the county Jail. (Am. Compl. ¶¶ 6-7.) Ballard's allegations also list the officials who held those positions between August 2014 and August 2016. (*Id.*) Even accepting those allegations as true, there is nothing in the record to show that any warden or sheriff had notice of any alleged inadequacy in Ballard's medical care. Instead, Ballard's answers to interrogatories acknowledge that he never communicated his complaints about medical care to any warden or sheriff. And while Ballard submitted a handful of inmate

14

grievances about his medical care, there is nothing in the record to indicate that any of those grievances were communicated to a sheriff or warden. Without such evidence, Ballard cannot establish either factor of the deliberate indifference test—i.e., awareness and inadequate response.

Moreover, even if there was evidence that a sheriff or warden knew about the details of Ballard's medical care at the Jail, that knowledge alone would not support an inference of deliberate indifference because non-medical personnel are presumptively entitled to rely on the judgment of medical professionals. Ballard clearly disagrees with the judgments made concerning his medical care, but his own opinion is not enough to show the "obvious incompetence" of the doctors' course of treatment. *See Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (even evidence that some medical professionals would have chosen different course of treatment is not enough to show that chosen course was incompetent); *see also Gering v. Kemper*, 803 Fed. Appx. 35, 37–38 (7th Cir. 2020) (18-month scheduling delay in offsite visit was not "obviously" inadequate where doctor was managing pain with medication during the waiting period). Ballard's failure to present evidence of awareness precludes a reasonable trier of fact from finding that a policymaker for the Sheriff's Office was deliberately indifferent to the alleged deficiencies in Ballard's medical care at the Jail. Accordingly, there is no genuine issue for trial, and Sheriff Kelley is entitled to summary judgment.

   3. **Causation**

The record is also devoid of evidence to show that the Sheriff's Office was the moving force behind the alleged denial of medical care to Ballard. *See Bd. of Comm'rs of Bryan Cnty.*, 520 U.S. at 399 (causation element of *Monell* claim requires proof that deliberate action of municipality is the "moving force" of the alleged constitutional violation); *Gonzalez v. McHenry*

15

*County*, 40 F.4th 824, 829 (7th Cir. 2022). There is nothing that would show that "a different policy would have led to faster treatment," or that any delay or denial of medical treatment "was an obvious consequence of the County's actions." *Turner*, 953 F.3d at 1017.

The undisputed evidence shows that the policy of the Sheriff's Office is to provide appropriate medical care to all Jail inmates. Consistent with that policy, Ballard was under a doctor's care during the entire period from August 2014 through August 2016. During this period, Ballard had daily access to nurses and was able to make written requests for health care if he believed he needed additional or different treatment.

The law encourages the division of labor in jails where non-medical administrators defer to the professional medical judgments of physicians and nurses. *McGee*, 55 F.4th at 569. Thus, where detainees are under the care of medical experts, it is presumptively reasonable for non-medical jail staff to trust the medical professionals to provide appropriate medical attention. *Miranda*, 900 F.3d at 343. In the present case, there is no dispute that Ballard was under a doctor's care at all times while he was detained at the county Jail. Thus, even if he was denied appropriate medical care, there is nothing in the record to suggest that the Sheriff's Office was the moving force behind such a denial of care. As a result, Ballard cannot establish the causation element of his *Monell* claim, and Kelley is entitled is summary judgment.

## Conclusion

For the above reasons, the Court grants Defendant Kelley's motion for summary judgment (ECF No. 173) and dismisses Ballard's claims against him. The Court will enter final judgment. Case dismissed.

**SO ORDERED.**                                                    **ENTERED: March 5, 2024**

_____

**HON. JORGE ALONSO**
**United States District Judge**