**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

Mark Ballard,

      Plaintiff,

    v.

Wesley R. Harmston, *et al.*,

      Defendants.

Case No. 16 C 8166

Judge Jorge L. Alonso

## <u>Memorandum Opinion and Order</u>

Pending before the Court is Defendant Wellpath LLC, previously known as Correct Care Solutions, LLC ("Wellpath"), and Defendant Dr. Wesley R. Harmston's ("Dr. Harmston") joint motion for summary judgment (ECF No. 179). For the reasons below, the Court grants the motion. Defendant Sheriff Michael Kelley's ("Kelley") motion for summary judgment (ECF No. 173) has been granted for the reasons set forth in a contemporaneous Opinion. Accordingly, the Court dismisses this case.

## Background

### I.   Procedural Background

In 2016, Plaintiff Mark Ballard ("Ballard") filed the instant action in this Court. (*See* ECF No. 1.) In his operative amended complaint, Ballard brings various claims under 42 U.S.C. § 1983 related to Defendants' conduct. (*See* First Am. Compl., ECF No. 21 ("Am. Compl.").) Specifically, Ballard claims that (1) all Defendants violated his civil rights under the Fourth, Eighth, and Fourteenth Amendments by failing to provide Ballard adequate medical care and treatment and by failing to intervene to prevent the violation of Ballard's civil rights; and (2) Dr.

Harmston failed to exercise due care in treating Ballard's injuries, for which Wellpath is also liable as Dr. Harmston's employer.

On April 14, 2023, Judge Kim struck Ballard's two-sentence purported expert report because it lacked the information required under Federal Rule of Civil Procedure 26(a)(2)(B). (Minute Entry dated April 14, 2023, ECF No. 170.) Because Ballard did not adequately disclose an expert, Wellpath and Dr. Harmston also did not disclose any experts.

Following discovery, Defendant Kelley, and Defendants Wellpath and Dr. Harmston, filed motions for summary judgment as to Ballard's claims (ECF Nos. 173, 179, respectively). Ballard did not file any response. Ballard is currently proceeding *pro se*, although he was represented by various appointed attorneys from shortly after this case's inception through the end of January 2023, including through discovery. (ECF Nos. 11, 153.) On March 13, 2023, Ballard filed a motion "for self-representation" and for time to seek out new counsel. (ECF No. 161.) Ballard provided a mailing address at 315 Healy Ave. in Romeoville, Illinois, as well as a telephone number and email address. On April 12, 2023, Ballard filed documents that again indicated he could be contacted at the same Romeoville address. (ECF No. 169.)

Kelley filed his motion for summary judgment on May 26, 2023, as well as a copy of the Notice to Pro Se Litigant Opposing a Motion for Summary Judgment required by Local Rule 56.2 ("Notice") (ECF No. 177) and a certificate of service stating that copies of the motion for summary judgment and related filings, including the Notice, were served on Ballard via U.S. Mail to Ballard's Romeoville address (ECF No. 178).

Dr. Harmston and Wellpath also filed their motion for summary judgment on May 26, 2023, but did not include a Local Rule 56.2 notice. Their counsel certified that their motion and related filings were served only via the Northern District of Illinois' electronic case filing system,

which sends a notice of filings to the attorneys of record. (ECF Nos. 179, 180, 181, 182.) Because there was no indication on the record that Ballard receives email notice via the Northern District of Illinois' electronic case filing system or that he was served at his Romeoville mailing address, the Court ordered Dr. Harmston and Wellpath to serve Ballard with their summary judgment materials at Ballard's Romeoville mailing address by January 12, 2024, and to file a certificate of service on the docket. (ECF No. 184.) Ballard was given until February 2, 2024, to respond to Dr. Harmston and Wellpath's motion. (*Id*.) On January 10, 2024, Dr. Harmston and Wellpath filed a certificate of service indicating that the summary judgment materials were served on Ballard at his Romeoville address via FedEx. (ECF No. 185.) Dr. Harmston and Wellpath do not, however, certify that they served Ballard with a Local Rule 56.2 notice. The Court nonetheless finds that this error is harmless because the record reflects that Ballard was properly served with a Local Rule 56.2 notice in conjunction with Defendant Kelley's motion for summary judgment. (ECF Nos. 177, 178); *Outlaw v. Newkirk*, 259 F.3d 833, 841 (7th Cir. 2001) (finding that failure to warn a *pro se* plaintiff of the need to respond to summary judgment motion with affidavits was harmless because the plaintiff suffered no prejudice); *Vesey v. Owens*, No. 13 CV 7367, 2015 WL 3666730, at *1 n.2 (N.D. Ill. June 12, 2015) (finding any error in a defendant's failure to serve a Local Rule 56.2 notice was harmless "given that defendants Miller and Thomas served plaintiff with same . . . well before plaintiff's response to defendants' motions was due"). Ballard has not filed a response.

Based on the above, the Court finds that Ballard has had sufficient notice of and time to respond to Dr. Harmston and Wellpath's motion.

## II. Factual Background

The following facts are undisputed unless otherwise noted.[1] The Court additionally assumes familiarity with and incorporates herein the Background Section set forth in its contemporaneous Opinion regarding Kelley's motion for summary judgment.

In August 2014, Ballard was arrested and became a pre-trial detainee at the Will County Adult Detention Facility (the "Jail") while his criminal case was pending in the Will County Circuit Court. (Kelley SOF ¶ 17.) Ballard was incarcerated at the Jail from August 10, 2014, to February 24, 2022, when he was released on bond. (Wellpath SOF ¶ 14.)

Shortly before his arrest, on August 10, 2014, Ballard was involved in an altercation during which he was hit numerous times with a bat to his head and body. (*Id.* ¶¶ 16, 40.) After the incident and early that same morning, he was taken to Bolingbrook Hospital where he was admitted for six to eight hours. (*Id.* ¶ 16.) While there Ballard was evaluated for a hematoma to

---

[1] Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment. The Court enforces Local Rule 56.1 strictly. *See McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 790 (7th Cir. 2019) ("We take this opportunity to reiterate that district judges may require strict compliance with local summary-judgment rules."). Where one party supports a fact with admissible evidence and the other party fails to controvert the fact with citation to admissible evidence, the Court deems the fact undisputed. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218–19 (7th Cir. 2015); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817–18 (7th Cir. 2004). This does not, however, absolve the party putting forth the fact of the duty to support the fact with admissible evidence. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012). In this case, Ballard did not respond to any Defendant's statement of facts. Accordingly, the Court has deemed admitted each of Defendants' facts to the extent that such fact was supported by citation to record evidence. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). Even so, Ballard's failure to file a response is not a basis for automatically granting the motion. *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021). Rather, the Court is mindful that the moving party has the "ultimate burden of persuasion" to show entitlement to judgment as a matter of law. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). The Court will apply these standards in evaluating the record. The Court refers to Defendant Michael Kelley's statement of facts (ECF No. 174) as "Kelley SOF" and to Defendants Wellpath and Harmston's statement of facts (ECF No. 181) as "Wellpath SOF."

the left side of his head, broken ribs, and injuries to his face, nose, mouth, and legs, and underwent x-rays and a CT scan. (*Id*.) Ballard's medical records from Bolingbrook Hospital show that Ballard received two head CT scans at Bolingbrook Hospital on August 10 and 11, 2014, which records Dr. Harmston reviewed on August 12, 2014, as part of Ballard's medical intake. (Wellpath SOF ¶ 16; *see also* Harmston Tr. 24:10–11, 36:8–10, 22–24.)

Once Ballard was cleared to leave the Hospital, he was released to the Romeoville Police and was taken to the Romeoville Police Department. (Wellpath SOF ¶ 17.) After he arrived at the Romeoville police station, Ballard was placed in an interview room and interrogated. (*Id*. ¶ 18.) Before the interrogation was concluded, Ballard experienced severe pain "all over" and was escorted back to Bolingbrook Hospital by the Romeoville Fire Department. (*Id*. ¶ 19.) During his second hospital visit, Ballard could not recall what tests were done, but recalled he underwent additional testing. (*Id*.) Ballard was discharged from Bolingbrook Hospital a few hours later and brought back to the same interview room where he was put in a holding cell. (*Id*. ¶ 20.)

On August 11, 2014, he returned to the Hospital a third time after he complained of extreme pain in his stomach and head. (*Id*. ¶ 21.) Ballard was present for a few hours before he was again discharged into the custody of the Romeoville Police Department. (*Id*.) At the Romeoville Police Station, he was kept in a holding cell for a few hours, taken back to an interrogation room, fingerprinted, and then ultimately transported to the Jail on August 11, 2014. (*Id*. ¶ 22.) While in the booking area, Ballard was assessed by a nurse where he reported extreme pain and she recommended he should be placed in the Medical Unit. (*Id*. ¶ 23.) According to Ballard's medical records, he presented to the clinic with multiple bruises to the torso and back with no open areas or swelling noted. (*Id*. ¶ 40.) Ballard stated that he was "hit multiple times with a bat on Saturday night" and admitted to falling unconscious for six minutes. (*Id*.) He

5

reported that he had a broken nose, broken teeth, and a broken left rib but no swelling or bruising to Ballard's nose was noted. (*Id*.)

Dr. Harmston testified, and Ballard's medical records show, that Ballard was prescribed 1000 mg of Tylenol and 500 mg of Naprosyn—forms of pain medication—for 14 days only one or two days after his arrival to the Jail. (Harmston Tr. 45:9–46:6.) Ballard testified that he was then placed back in a holding cell, but it is undisputed that he was placed in the Medical Unit at some point not long thereafter. (Wellpath SOF ¶¶ 24, 40.) Ballard's only treatment plan upon his discharge was to follow up with Dr. Mohammed Arain as needed and return to the emergency department if his symptoms worsened. (*Id*. ¶ 40.)

Ballard testified that Dr. Harmston assessed Ballard in the doctor's office before Ballard was transferred to the general population area of the Jail. (*Id*. ¶ 25.) Ballard reported that he had some broken teeth and was experiencing pain. (*Id*.) Ballard also reported he had had hernia surgery at Bolingbrook Hospital on July 29, 2014, ten days before he was taken to Jail (*id*. ¶ 26), although Ballard's medical records show that the surgery took place on July 27, 2014. (*Id*. ¶ 40.) In any event, Ballard showed Dr. Harmston the three sutures from that surgery and stated that they should be removed in two weeks. (*Id*. ¶ 26, 40.) Ballard testified that the doctor who performed the hernia surgery told him that he would need to come back to have his stitches removed. (*Id*. ¶ 27.) Ballard stated that he did not have his stitches removed at the Jail, but believed they may have fallen out on their own. (*Id*.) However, Ballard's medical records show that on August 21, 2014, Ballard underwent suture removal at 8:00 am. (*Id*. ¶ 41.) Other than his initial visit with Dr. Harmston, Ballard could not recall any other visits or encounters with Dr. Harmston while he was at the Jail nor did he have any knowledge of how long Dr. Harmston worked at the Jail. (*Id*. ¶ 28.)

Ballard was transferred to the general population area of the Jail. (*Id*. ¶ 25.) Based on Dr. Harmston's review of the intake records, he ordered Ballard to sleep in the bottom bunk for 90 days. (Harmston Tr. 47:9–14.) Ballard later testified that he asked for additional treatment through sick call slips and was placed back in the Medical Unit for ten days in October 2014 by Dr. Harmston for one of his pre-arrest injuries. (Wellpath SOF ¶ 29.) Ballard could not remember the number of times he was placed in the Medical Unit but stated that each stay was related to the August 10, 2014 incident. (*Id*. ¶ 30.) However, he later testified that he was placed in the Medical Unit for another issue outside of the incident. (*Id*.) Ballard also could not remember the first time he submitted a sick call slip. (*Id*. ¶ 37.) He did not have any sick call slips in his possession that he had not produced. (*Id*.)

Ballard's medical records show that on October 14, 2014, Ballard complained of a backache and right foot edema. (*Id*. ¶ 43.) On October 15, 2014, Ballard reported right ankle pain and right foot swelling. (*Id*. ¶ 42.) Dr. Harmston determined it was likely cellulitis and ordered x-rays of Ballard's ankle. (*Id*.) Ballard was prescribed Bactrim for ten days and Naproxen. (*Id*.) Ballard was instructed to return for a follow-up appointment in seven days. (*Id*.)

Ballard returned on October 22, 2014, where he complained of redness to the right foot, which was resolving. (*Id*. ¶ 44.) The edema and tenderness in his foot had improved. (*Id*.) Diagnosed with cellulitis and possible gout, Ballard was prescribed 500 mg of Naproxen, restricted to the bottom bunk for fourteen days, instructed to follow up in fourteen days on November 6, 2014, and cleared from medical housing back to the general population. (*Id*.) On November 6, 2014, Ballard again returned for a follow-up visit where he was diagnosed with either the flu or cellulitis, and he was instructed to follow up as needed. (*Id*. ¶ 45.)

Ballard returned for a Chronic Care/Acute Care Visit on December 8, 2014, where he reported headaches at night after being hit in the head with a baseball bat. (*Id*. ¶ 46.) He also complained of right foot discomfort. (*Id*.) Dr. Harmston prescribed Ballard 500 mg of Naproxen and ordered an x-ray of his right foot. (*Id*.) On December 29, 2014, Ballard complained of great left toe swelling and tenderness, pain in the right first toe due to a gout flare for the past two days. (*Id*. ¶ 47.) He was prescribed 100 mg of Allopurinol for fourteen days and instructed to follow up on January 12, 2015. (*Id*.) Allopurinol is used to treat gout and prevent increased uric acid levels in patients. (*Id*. n.3.)

On January 12, 2015, Ballard returned for a follow-up appointment where he reported left great toe discomfort and redness/inflammation as well as intermittent migraines. (*Id*. ¶ 48.) Dr. Harmston noted that the right toe was well-appearing. (*Id*.) He was prescribed 500 mg of Naprosyn and 100 mg of Allopurinol for thirty days and instructed to return in thirty days. (*Id*.) On January 17, 2015, Ballard requested a renewal of Naprosyn and Allopurinol. (*Id*. ¶ 49.) Dr. Harmston noted that after the Motrin prescription ended, Ballard was prescribed 500 mg of Naprosyn for seven days and 100 mg of Allopurinol for seven days. (*Id*.)

On March 6, 2015, Ballard reported discomfort in his knees as well as intermittent migraines to the left and frontal head. (*Id*. ¶ 50.) Diagnosed with migraines and gout, Ballard was prescribed Allopurinol and Naproxen for 10 days. (*Id*.)

On February 18, 2015, March 13, 2015, and April 1, 2015, Ballard refused dental treatment after reporting he needed to get pictures of his teeth for his lawyer. (*Id*. ¶ 51.)

Ballard returned on April 3, 2015, for a Chronic Care/Periodic Exam Follow-Up Visit where he reported continued intermittent headaches, improved lower back pain, occasional dizziness, and lightheadedness. (*Id*. ¶ 51.) Ballard was prescribed Flexeril and Mobic. (*Id*.)

Flexeril (also known as cyclobenzaprine) is used to treat muscle spasms. (*Id*. n.4.) Mobic (also known as Meloxicam) is a nonsteroidal anti-inflammatory drug used to treat arthritis. (*Id*. n.5.) Ballard refused to take Flexeril because it was too strong. (*Id*. ¶ 51.)

Ballard returned on May 17, 2015, and complained of migraine headaches. It was noted that Ballard was not adherent to the prescribed medication. Diagnosed with migraines and pain in his lower back, Ballard was prescribed Mobic and instructed to follow up in twenty-one days. (*Id*. ¶ 53.) On May 26, 2015, Ballard returned and reported ringing in his ear after being hit in the head. (*Id*. ¶ 54.) He was referred to an ophthalmologist by Dr. Harmston. (*Id*.)

On May 29, 2015, Dr. Harmston saw Ballard for a vision check. (*Id*. ¶ 55.) This was Dr. Harmston's final appointment with Ballard before the end of his employment with Wellpath. (*Id*.) Following Ballard's May 29, 2015 appointment with Dr. Harmston, Dr. Young Kim treated Ballard until his release in February of 2022. (*Id*.)

Ballard experienced migraine headaches, pain in his eyes, and a wandering eye during his incarceration at the Jail. (*Id*. ¶ 34.) Ballard experienced the same symptoms very slightly before his incarceration. (*Id*.) Ballard admitted that he was seen by a neurologist while he was at the Jail, but he could not recall the date of the appointment, or what her findings were during his initial appointment. (*Id*. ¶ 35.) Ballard reported that the neurologist, "made reference to probably some of the vitamins and stuff like that I should be taking." (*Id*.)

Ballard did not recall how many times he left the Jail to see an off-site specialist or doctor but reported it was more than once. (*Id*. ¶ 31.) Ballard testified that the first time he went off-site for care, he went to a pediatric eye care doctor in Joliet, Illinois for his astigmatism. (*Id*. ¶ 32.) He also saw a urologist for pain in his lower abdomen, an adult eye doctor, a neurologist, and a

dermatologist. (*Id*.) Ballard believed that he had been referred to see a neurologist for his migraine headaches and other injuries sustained on August 10, 2014. (*Id*. ¶ 33.)

Ballard's medical records show that on July 27, 2015, Ballard was referred for an MRI and CT scan of the head to address his complaints of headaches. (*Id*. ¶ 56.) On August 19, 2015, Ballard underwent an MRI at Presence Saint Joseph Medical Center which revealed a normal non-contrast MRI of the brain. (*Id*. ¶ 57.) Ballard testified that the Will County Medical Staff addressed the next steps and process for his condition. (*Id*. ¶ 36.)

Ballard's medical records also show that on May 24, 2016, an Off-Site Visit request form was entered after Ballard underwent an eye exam. (*Id*. ¶ 59.) Diagnosed with diplopia (i.e., double vision) secondary to alternating exotropia (i.e., a wandering eye), it was recommended that Ballard see a pediatric ophthalmologist. (*Id*.) He was referred to Spectrum Ophthalmology on May 26, 2015, and prescribed 7.5 mg of Meloxicam for 60 days. (*Id*.) While Ballard was an inmate at the Jail, he underwent two eye surgeries, one in 2017 and the other in 2018 or 2019. (*Id*. ¶ 38.) He could not recall the exact dates of his eye surgeries. (*Id*.)

Ballard was seen by Dr. Kim on August 7, 2016, October 27, 2016, January 3, 2017, March 31, 2017, and April 28, 2017, for issues with his vision, hematuria, and kidney stones. (*Id*. ¶ 60.) During his treatment with Dr. Kim, Ballard underwent a CT scan of his abdomen which was unremarkable except for a 4 mm lesion in his left kidney. (*Id*.) Ballard was admitted to Silver Cross Hospital on December 19, 2016, with complaints of recurring hematuria and underwent a CT scan of the abdomen ordered by Dr. Kim. (*Id*. ¶ 61.) The CT scan revealed thoracic spine and lumbar spine spurring, and a prominent spleen size, but was otherwise unremarkable. (*Id*.)

On February 27, 2017, Ballard was seen at Advanced Urology Associates for complaints of hematuria where he underwent a cystoscopy and was instructed to follow up yearly. (*Id*. ¶ 62.) Ballard was admitted to Silver Cross Hospital on March 13, 2017, for complaints of gross hematuria where he underwent a CT scan of the abdomen. (*Id*. ¶ 63.) The CT scan revealed an otherwise unremarkable CT urogram, mild splenomegaly, and mild prostatomegaly. (*Id*.) On April 28, 2017, Ballard returned for a follow-up appointment after he was seen in the ophthalmology clinic on March 31, 2017. (*Id*. ¶ 64.) At his appointment, Ballard complained of persistent headaches on and off after the 2014 incident. (*Id*.) Dr. Kim recommended that Ballard be referred to neurology for further evaluation. (*Id*.)

At least as of May 2023, Ballard took Tramadol for his migraine headaches and "other pain in other areas as needed." (*Id*. ¶ 39.) He had a corrective lens prescription, issued to him by the Jail, and still suffered from blurred vision and pain in his eyes. (*Id*.)

## Legal Standard

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wackett v. City of Beaver Dam*, 642 F.3d 578, 581 (7th Cir. 2011). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Summary judgment is the proverbial put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020) (internal quotation marks omitted). "To defeat a motion for summary judgment, the party opposing it must make a 'showing sufficient to establish the existence of [any challenged] element essential to the party's case, and

on which that party will bear the burden of proof at trial.'" *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893–94 (7th Cir. 2018) (quoting *Celotex v. Catrett*, 477 U.S. 317, 322 (1986)). The court may not weigh conflicting evidence or make credibility determinations, but the party opposing summary judgment must point to competent evidence that would be admissible at trial to demonstrate a genuine dispute of material fact. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013).

In assessing the evidence at summary judgment, the court must consider the facts in the light most favorable to the non-moving party, giving that party "the benefit of all conflicts in the evidence and reasonable inferences that may be drawn from the evidence," regardless of whether it can "vouch for the objective accuracy of all" the evidence the non-moving party puts forward. *Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 674 (7th Cir. 2014). Even though district courts must view the non-moving party's evidence in this generous light, it does not follow that they are "required to draw every requested inference; they must only draw reasonable ones that are supported by the record." *Omnicare*, 629 F.3d at 704. "Inferences supported only by speculation or conjecture will not suffice." *Johnson*, 892 F.3d at 894.

## Discussion

Dr. Harmston and Wellpath argue that they are entitled to summary judgment because Ballard's allegations of inadequate and delayed medical care are unsupported by any evidence. The Court agrees.

Pre-trial detainees have a right to adequate medical care under the Fourteenth Amendment. *McGee v. Parsano*, 55 F.4th 563, 569 (7th Cir. 2022) (citing *Kingsley v. Hendricksen*, 576 U.S. 389, 397 (2015)). The Seventh Circuit set forth the following test:

> For a pre-trial detainee to prevail on a claim of deficient medical treatment, he must demonstrate two things. First, he must show that the defendants acted purposefully, knowingly, or recklessly. . . . A showing of only negligence or even gross negligence will not suffice to meet this standard. . . . Second, he must proffer evidence showing that the course of treatment he received was objectively unreasonable. . . . This standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided medical care and to gauge objectively - without regard to any subjective belief held by the individual - whether the response was reasonable.

*Turner v. Paul*, 953 F.3d 1011, 1015 (7th Cir. 2020) (cleaned up) (citing *McCann v. Ogle Cnty., Illinois*, 909 F.3d 881, 886 (7th Cir. 2018); *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018)).

Ballard alleges he was denied appropriate medical care in the following ways:

(a) he should have stayed in the medical unit after he first arrived at the Jail, but was instead transferred to general population, which required him to exert himself physically by standing for head counts and retrieving trays and laundry and caused him severe pain;

(b) he continued to complain to Jail personnel about his injuries, pain, and need for treatment, including for his head injury, which were ignored until he was prescribed medication that was supposed to be for pain but was in fact to treat withdrawal symptoms, which Ballard did not have;

(c) stitches from his pre-arrest hernia surgery should have been removed shortly after his arrival at the Jail but were not;

(d) he should have received an MRI for his pre-arrest head injuries shortly after arriving at the Jail but he did not receive the MRI until August 2015;

(e) he should have been taken to an eye specialist shortly after May 2015 but was not taken until April 2016, and then experienced a similar delay for the follow-up appointment; and

(f) he should have been seen by a neurologist but was not allowed to do so.

(Am. Compl. ¶¶ 15–22). Ballard alleges that "[a]s a result of the lack of care and inadequate care Ballard received, Ballard continues to suffer extreme pain, migraine headaches, double vision, hearing loss, numbness in his face, slurred speech, and mental and emotional distress." (*Id.* ¶ 23.)

The Court addresses Ballard's allegations with respect to each Defendant in turn.

## I. Dr. Harmston

The record is entirely devoid of any evidence that would support five of Ballard's six allegations of medical denial or delay, and Ballard fails to show that the course of treatment he received was objectively unreasonable.[2]

Allegations (b) and (f) are summarily dealt with. There is no mention, let alone evidence, in the record of any failure to prescribe pain medication or to refer to a neurologist, or of any prescription for withdrawal symptoms that Ballard did not have. To the contrary, Dr. Harmston testified, and Ballard's medical records show, that Ballard was prescribed 1000 mg of Tylenol and 500 mg of Naprosyn—forms of pain medication—for 14 days only one or two days after his arrival to the Jail. And Ballard himself testified that he saw a neurologist for his migraine headaches at the recommendation of a Jail physician. At the summary judgment stage, a plaintiff can no longer rely merely upon allegations—there must be evidence to back it up. *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004) ("The mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the nonmovant must present definite, competent evidence in rebuttal."); *see also Gering v. Kemper*, 803 Fed. Appx. 35, 37–38 (7th Cir. 2020) (18-

---

[2] Dr. Harmston points out that the scope of his potential liability is limited to the period between August 11, 2014, when Plaintiff arrived at the Jail, and July 2015, when Dr. Harmston's employment at the Jail ended. *See Munson v. Gaetz*, 673 F.3d 630, 637 (7th Cir. 2012) (finding that "§ 1983 liability 'requires personal involvement in the alleged constitutional deprivation'" (internal quotation marks omitted) (citing *Minix v. Canarecci*, 597 F.3d 824, 833–34 (7th Cir. 2010))). That limitation is ultimately irrelevant to the Court's analysis, however, given the lack of evidence of any medical denial or delay.

month scheduling delay in offsite visit was not "obviously" inadequate where doctor was managing pain with medication during the waiting period).

Next, Ballard alleges that he should have received an MRI for his pre-arrest head injuries shortly after arriving at the Jail but did not receive the MRI until August 2015. Ballard proffers nothing but his own opinion—in the form of unverified allegations—in support. There is no testimony, affidavit, medical records, or expert opinion indicating that Ballard required an MRI before August 2015 or illuminating why he alleges an MRI was even necessary. *See Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (even evidence that some medical professionals would have chosen different course of treatment is not enough to show that chosen course was incompetent).

On the other hand, Ballard's medical records from Bolingbrook Hospital show that Ballard received two head CT scans at Bolingbrook Hospital on August 10 and 11, 2014, which records Dr. Harmston reviewed on August 12, 2014, as part of Ballard's medical intake. Based on his review of the intake records, Dr. Harmston ordered Ballard to sleep in the bottom bunk for 90 days. In August 2015, Ballard did undergo an MRI. There is nothing in the record indicating that the results of the MRI were abnormal or what the effect of an earlier MRI would have been. *Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir. 2002) ("[P]risoner who complains that delay in medical treatment rose to the level of a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment in order to succeed[.]" (citing *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996))). In short, there is simply no evidence to support Ballard's allegation that medical care was delayed or denied with respect to an MRI.

15

Ballard next alleges that because he was transferred out of the medical unit into the general population shortly after arriving at the Jail, he was required to exert himself physically, such as by standing for head counts, and retrieving meal trays and laundry, which caused him "severe pain." (Am. Compl. ¶ 17.) There is no evidence whatsoever—whether in the form of Ballard's testimony or affidavit or an expert opinion—that the move to general population caused Ballard pain or that there was any medical reason that Ballard should have stayed in the medical unit. To the contrary, Dr. Harmston testified that he made the decision to clear Ballard from medical housing based on his medical evaluation and observation of Ballard. In short, there is no evidence to support Ballard's bald allegation that medical care was delayed or denied with respect to his move to the general population.

Ballard also alleges that he should have been taken to an eye specialist shortly after May 2015, but was not taken until April 2016, and then experienced a similar delay for the follow-up appointment. Again, there is no evidence in any form to support Ballard's claim. There is nothing to show that Ballard needed to see an eye specialist in May 2015 as he alleges or, even if he did, that he suffered any detrimental effect by waiting until April 2016. *Walker*, 293 F.3d at 1038. Further, nothing in the record indicates that the wait time was within the Jail medical staff's control. At his deposition, Ballard stated that when he inquired about the status of his offsite appointment, he was told there were difficulties in finding an offsite doctor who would see him. The unavailability of outside specialists or scheduling difficulties do not constitute the denial of medical care. *See id.* (courts do not presume delays in specialist treatment are attributable to prison medical professionals, but rather require evidence showing the delays were within the control of the medical staff); *see also Langston*, 100 F.3d at 1241 (delays in medical treatment due to scheduling difficulties or bureaucratic obstacles are not unconstitutional).

16

Next, Ballard alleges that stitches from his pre-arrest hernia surgery should have been removed shortly after his arrival at the Jail but were not. Ballard testified that the doctor who performed the hernia surgery told Ballard his stitches needed to be removed within two weeks of the surgery. Ballard's medical records show the stitches were removed on August 21, 2014, which results in a dispute of fact. Even so, however, the dispute is not material to the resolution of the issue before the Court. Even inferring in Ballard's favor that his stitches were not removed and either fell out on their own or were covered up by skin, there is no evidence of any detrimental effect. *Walker*, 293 F.3d at 1038. This amounts, at most, to mere negligence, which is insufficient to show that Dr. Harmston "purposefully, knowingly, or recklessly" provided deficient medical treatment.

The record reflects that Ballard regularly saw nurses and doctors about his medical concerns while he was incarcerated at the Jail and received treatment in accordance with his symptoms. Ballard was taken out of the Jail on numerous occasions to see offsite specialists, including a neurologist, a urologist, a pediatric eye doctor, an adult eye doctor, and a dermatologist, and underwent multiple diagnostic tests, including x-rays, CT scans, and an MRI. There is simply no evidence that might suggest, let alone prove, that Dr. Harmston purposefully, knowingly, or recklessly failed to provide objectively reasonable medical care to Ballard. Summary judgment is therefore granted in Dr. Harmston's favor.

## II.    Wellpath

Ballard alleges that Wellpath knowingly maintained a policy or procedure in which employees routinely failed or refused to properly examine inmates, provide medication to inmates, comply with inmate requests, and treat inmates with signs of serious medical conditions. (Am. Compl. ¶¶ 29–30.)

Wellpath, a medical contractor, can only be held liable under Section 1983 for its own constitutional violations and is not vicariously liable for the constitutional torts of its employees. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–94 (1978); *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 616 (7th Cir. 2022) (applying *Monell* to medical contractor acting under color of state law). Accordingly, to hold Wellpath liable, Ballard must have evidence to show: (1) inmate medical care was denied pursuant to a municipal policy, (2) policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) the municipal action was the "moving force" behind his own constitutional injury. *Pulera v. Sarzant*, 966 F.3d 540, 550 (7th Cir. 2020) (internal punctuation omitted) (citing *Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020); *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404-07 (1997)). "The central question under *Monell* is 'always whether an official policy, however expressed[,] ... caused the constitutional deprivation.'" *Turner*, 953 F.3d at 1016 (quoting *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378 (7th Cir. 2017)).

Wellpath argues that Ballard's *Monell* claim fails as a matter of law because there is no evidence of inadequate medical care, let alone a municipal policy. To prove the existence of a municipal policy, a plaintiff can offer evidence of: (i) an express or written policy, (ii) a widespread custom or practice, or (iii) a deliberate act by a decision-maker with final policymaking authority. *King v. Kramer*, 763 F.3d 635, 649 (7th Cir. 2014) (citing *Ienco v. City of Chicago*, 286 F.3d 994, 998 (7th Cir. 2002)). Ballard bases his claim on the second theory of liability, alleging there was a widespread practice of denying appropriate medical care to inmates at the Jail. The Seventh Circuit has "not adopted bright-line rules defining 'widespread custom or practice,' but there must be some evidence demonstrating that there is a policy at issue rather than a random event or even a short series of random events." *Bridges v. Dart*, 950 F.3d 476, 479

18

(7th Cir. 2020). "The plaintiff must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Id.* At the very least, Ballard "must point to other inmates injured by that practice." *Stockton*, 44 F.4th at 617.

Although Ballard alleged that other unidentified inmates similarly alleged in grievances and lawsuits that they too were denied appropriate medical treatment (Am. Compl. ¶ 31), Ballard has never identified any such persons or produced any information to substantiate this allegation. Further, for the reasons set forth above, the record is devoid of any evidence of delayed or denied medical care except with respect to Ballard's stitches from his pre-arrest hernia surgery regarding which, as noted above, there is no evidence of any detrimental effect. In any event, one isolated instance of denied medical care does not, without more, show a widespread pattern. *See Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020) (in case involving only one person complaining of delayed medical care, five instances over a 19-month period was insufficient to show a widespread policy); *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) (in case involving only one person complaining of delayed medical care, four instances over an 11-month period was insufficient to show a widespread policy).

Wellpath also argues that Ballard fails to show any policymaker acted with deliberate indifference. The Court agrees. Although "deliberate indifference to a detainee's medical needs is not . . . required to sustain a Fourteenth Amendment claim[,] . . . the concept of deliberate indifference does come into play in assessing liability of a governmental entity under *Monell*." *Whitney v. Khan*, No. 18 C 4475, 2021 WL 105803, at *6 (N.D. Ill. Jan. 12, 2021). An official acts with deliberate indifference when the official: (i) is aware of facts from which an inference could be drawn that a substantial risk of harm exists, and (ii) responds with a reckless disregard

19

for the known serious medical need, either by inaction or woefully inadequate action. *Eagan v. Dempsey*, 987 F.3d 667, 695 (7th Cir. 2021). The plaintiff need not show that the official intended harm or believed that harm would occur but must present evidence showing more than negligence by the official. *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011).

In this case, there is no evidence showing that any Wellpath policymaker was aware of the alleged inadequacies in Ballard's medical care. Ballard alleges that Wellpath "promulgated rules, regulations, policies, and procedures for the medical screening, treatment, and overall medical care of inmates" at the Jail. (Am. Compl. ¶ 3.) Ballard does not identify any specific policymakers at Wellpath, and there is nothing in the record to show that any policymaker at Wellpath had notice of any alleged inadequacy in Ballard's medical care. Without such evidence, Ballard cannot establish either factor of the deliberate indifference test—i.e., awareness and inadequate response.

Having failed to present evidence of either a widespread policy or deliberate indifference, Ballard is also unable to show causation. Accordingly, there is no genuine issue for trial, and Wellpath is entitled to summary judgment.

## Conclusion

For the above reasons, the Court grants Dr. Harmston and Wellpath's motion for summary judgment (ECF No. 179) and dismisses Ballard's claims against them. The Court will enter final judgment. Case dismissed.

**SO ORDERED.**                                    **ENTERED: March 5, 2024**

_____

**HON. JORGE ALONSO**
**United States District Judge**